# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| SBC ADVANCED SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff/Counter Defendant, | ) | |
| | ) | |
| v. | ) | No. 4:13-CV-1711 CAS |
| | ) | |
| COMMUNICATIONS WORKERS OF | ) | |
| AMERICA, DISTRICT 6, | ) | |
| | ) | |
| Defendant/Counter Claimant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the parties' cross motions for summary judgment. The motions are fully briefed and ready for decision. For the following reasons, the Court will grant defendant Communications Workers of America, District 6's ("CWA" or "the union") summary judgment motion and deny plaintiff SBC Advanced Solutions, Inc.'s ("ASI" or "the company") motion for summary judgment.

## I. Background

This is an action to vacate an arbitration award that requires ASI to pay additional compensation to employees at its Earth City, Missouri call center who have been working at a higher-paid job title, service representative, while being paid at a lower-paid job title, customer service representatives. After sustaining the employees' grievance, the arbitrator retained jurisdiction for the specific purpose of resolving any dispute regarding the application of the awarded make-whole remedy. In its motion for summary judgment, ASI asks the Court to vacate the labor arbitration award and the arbitrator's post-award ruling.

Defendant CWA has also moved for summary judgment on its counterclaim to enforce the underlying arbitration award. Alternatively, CWA seeks to have the matter remanded to the

arbitrator pursuant to the arbitrator's retained jurisdiction to resolve the dispute regarding the awarded make-whole remedy. CWA also seeks an order requiring ASI to pay its reasonable attorneys' fees because ASI's refusal to comply with the arbitration award and its suit to vacate the award are without substantial justification.

## II.     Standard of Review of Arbitration Award

Review of a commercial arbitration award is governed by the FAA. The Eighth Circuit has often stated that "judicial review of an arbitration award is extremely limited." Val-U Constr. Co. of S. Dak. v. Rosebud Sioux Tribe, 146 F.3d 573, 578 (8th Cir. 1998). The Supreme Court of the United States has observed that courts will set aside arbitrator's decisions "only in very unusual circumstances." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 942 (1995). "Arbitration awards should be construed, whenever possible, so as to uphold their validity." Delta Mine Holding Co. v. AFC Coal Properties, Inc., 280 F.3d 815, 923 (8th Cir. 2001). Courts do not review the merits of the arbitration award, and where the arbitrator is even arguably construing or applying the contract and acting within his authority, a court cannot overturn the decision even if it is convinced that the arbitrator committed serious error. See Osceola County Rural Water Sys., Inc. v. Subsurfco, Inc., 914 F.2d 1072, 1075 (8th Cir. 1990) (quoting United Paperworks Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987)).

The FAA lists only four narrow bases for vacating an arbitration award: (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators; (3) where the arbitrators were guilty of misconduct in refusing to hear evidence material to the controversy, or of any other misbehavior; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made. See 9 U.S.C. § 10(a).

In addition to the statutory grounds for vacatur, the Eighth Circuit has recognized two non-statutory bases for vacating an arbitration award: where the award "is completely irrational or evidences a manifest disregard for the law." Hoffman v. Cargill Inc., 236 F.3d 458, 461 (8th Cir. 2001) (quoting Val-U Constr. Co., 146 F.3d at 578 (internal quotations and citations omitted)). "These extra-statutory standards are extremely narrow: An arbitration decision may only be said to be irrational where it fails to draw its essence from the agreement, and an arbitration decision only manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it." Id. at 461-62 (citation omitted). A court "may not set aside an award simply because [it] might have interpreted the agreement differently or because the arbitrators erred in interpreting the law or in determining the facts." Id. (internal quotation and citation omitted). "Rather, the contract must not be susceptible of the arbitrator's interpretation." Id.

## III. Facts

In the late 1990s, for regulatory reasons Southwestern Bell's parent company SBC Communications created a new affiliate company to handle DSL internet service. That company became ASI, and its union-represented employees were covered by the same collective bargaining agreement ("CBA") as those in Southwestern Bell.

ASI opened a call center in Earth City, Missouri in 1999. It staffed this center with several different job titles under the CBA, including customer service representatives ("CSRs") and service representatives ("SRs"). SRs are paid more than CSRs under the CBA. The CSRs worked primarily on "trouble tickets" or work orders. The CSRs' job description states, in relevant part, that a CSR "[p]rimarily receives, screens, tests, analyzes, and dispatches trouble reports; explains and suggests various services and/or products to customers; performs other generally related functions." (JR

3

256).¹  The SRs' job description states, in relevant part, that a SR "[h]andles the business transactions in connection with customers' accounts, including telephone and correspondence contacts and collection and order work."  (JR 254).

In November 2008, approximately twenty CSRs at the Earth City facility filed a grievance through their union, defendant CWA, alleging they were performing higher-paid SR work and were entitled to a pay differential when working on service orders.  CWA alleged a violation of Article XV, Section 7, which states in relevant part:

> Section 7.  **All Other Temporary Work in a Higher Position**
>
> a.  A qualified employee not otherwise covered by the provisions of Sections 1. through 5. above, who is temporarily scheduled or assigned and does work in a position with a higher established maximum rate of pay throughout a period of two (2) or more full tours in a work week, except for the purposes of training, shall receive for each full tour worked in such position a Classification Differential equal to one-fifth (1/5) of the amount of the weekly wage progression increase to which the employee would at the time be entitled if the employee were actually changed to the higher applicable classification at the employee's regular location.

CWA demanded arbitration of its grievance, and the parties proceeded to arbitration under the labor arbitration rules of the American Arbitration Association ("AAA"), which rules are expressly a part of the parties' arbitration provisions in their CBA.

The parties' arbitration provisions state in part:

> Section 2.  In the event that either party hereto, within sixty (60) days after completion of the Formal Grievance procedure aforesaid, elects to submit a matter described in the preceding section to arbitration, the parties agree that the matter shall be so submitted and agree that such submission shall be to one (1) arbitrator . . . . [T]he arbitration shall be conducted under the then obtaining rules of the Voluntary Labor Arbitration Tribunal of the American Arbitration Association . . . .

---

¹The parties submitted a joint record of exhibits supporting their cross motions for summary judgment.  The joint record consists of the entire record of proceedings from the underlying labor arbitration.  See Doc. 22.  This joint record will be cited throughout this Memorandum and Order as (JR ___).

4

Section 3. The arbitrator shall be confined to the subjects submitted for decision, and may in no event, as part of any such decision impose upon either party any obligation to arbitrate on any subjects which have not herein been agreed upon as subjects for arbitration; nor may the arbitrator, as a part of any such decision, effect reformation of the contract, or of any of the provisions thereof.

Section 4. The decision of the arbitrator, selected in accordance with Section 2. hereof, shall be final, and the parties agree to be bound and to abide by such decision.

As to the union's claim under Article XV, Section 7, the parties agreed that the union had the burden of proving all of the four following elements, showing that all the CSR grievants:

1. Were "qualified" for the higher title whose work the union claims the grievants are performing;

2. Were "temporarily scheduled or assigned" to the allegedly higher work;

3. Performed the allegedly higher work "throughout two or more full tours in a work week"; and,

4. Performed "work in a position with a higher established maximum rate of pay."

(JR at 2831).

The parties could not agree as to the statement of the issue to be decided at arbitration, but jointly stipulated that the arbitrator had the authority to frame the issue. (JR 1929-30). The arbitrator framed the issue at arbitration as follows:

Whether the Grievants are entitled to a classification differential under Article XV, Section 7 of the 2004 Departmental Agreement? If so, what is the appropriate remedy?

(JR 2821).

Arbitrator William L. McKee, Ph.D., issued his final award on May 31, 2013. He sustained the grievance and ruled that the grievants were entitled to be made whole for their losses. He stated

5

further that he "retain[s] jurisdiction for the specific purpose of resolving any disputes that may arise between the parties about the application or interpretation of this awarded remedy." (JR 2839).

ASI did not participate in any proceedings pursuant to the reserved jurisdiction. ASI reasoned that under AAA rules and the doctrine of *functus officio*, the arbitrator has no further authority or jurisdiction after he has issued his final award. Arbitrator McKee, however, held it was appropriate for him to retain and exercise jurisdiction to effectuate the award. He based this ruling on the provision of *The Code of Professional Responsibility for Arbitrator of Labor-Management Disputes* that permits the retention of remedial jurisdiction even in the absence of consent from the parties. (JR 3004-07).

## IV. Discussion

At arbitration, the parties agreed that the Union must prove the following elements to establish a violation of Article XV, Section 7: (1) a "qualified employee"; (2) temporarily scheduled or assigned to perform work in a higher classification; (3) did perform the work in a position with a higher established maximum rate of pay; (4) throughout a period of two or more full tours in a work week. As to each element, ASI argues the underlying arbitration award fails to draw its essence from the parties' CBA.

### A. A "Qualified Employee"

Article XV, Section 7 requires that the grievant be a "qualified employee" to receive the pay differential at issue. ASI argues that "qualified" as used in the CBA means "test qualified," that is, employees seeking the pay differential had to have passed the tests required of the higher-paid title. ASI supported its position at arbitration with its Labor Relations Director, Lindsay Larson's, testimony, in which he cited the original bargaining history documents from the negotiation of the

6

CBA. In these notes of the negotiations, the chief bargainer for the company, Zac Bettis, states that qualified "means test qualified." (JR 1562).

For its part, defendant CWA states that the phrase "test qualified" does not appear in the CBA. It states further that the Court's assessment of the arbitrator's interpretation of the word is limited to determining whether the arbitrator was acting within his jurisdiction and if the construction draws upon the CBA. The Court does not review the award to determine whether it was correct. Putting that aside, CWA argues that ASI's evidence regarding the meaning of the word "qualified" did not persuade the arbitrator. The arbitrator's decision was informed by an earlier arbitration award he issued concerning Article XV, Section 7 and another arbitration in 2012 that held employees need not be test qualified to receive the classification differential.

In his arbitration award, Arbitrator McKee reviewed two prior cases in which he interpreted the CBA's use of the term "qualified" in Article XV, Section 7: Senior Reports Clerks, AAA Case No. 70 300 00505 06 (JR 2618-28), and Thomas White, AAA Case No. 70 300 00788 07 (JR 2760-67). In Senior Reports Clerks, he held that "qualified" did not mean "test qualified" as the company had argued. In Thomas White, he determined the grievant was not "qualified" because he did not have the licensure qualifications that were bargained for and added to the position description. In addition, he found evidence that grievant was not assigned the duties of the higher job classification.

In this arbitration, consistent with his prior determinations, Arbitrator McKee found that an employee could be "qualified" if there is evidence that management had selected certain employees capable of performing the duties of the higher classification, trained these employees to perform the duties of the higher classification, and assigned these employees to perform the new work on a regular basis. Arbitrator McKee then addressed the "credible testimony of Mr. Larson," and the bargaining history evidence introduced by ASI. He stated that he was not persuaded by this

7

evidence because despite the company stating its interpretation of the term "qualified," the union did not agree to change the language of the CBA to reflect this interpretation. The CBA unambiguously states "[a] qualified employee," not "a test qualified employee." Additionally, the parties left the term "qualified" unchanged when they negotiated the 2009 CBA.

The Court finds the arbitrator's award draws its essence from the CBA and is not merely the arbitrator's "own brand of industrial justice." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987). The Court is not authorized to reconsider the merits of the award, but merely determine whether the arbitrator has exceeded his authority. The arbitrator analyzed the issue of "qualified" versus "test qualified" by examining his prior decisions on this issue. He also credited the testimony of ASI's witness, Mr. Larson, and the bargaining history evidence he introduced at the hearing. This additional evidence, however, did not alter his prior analyses. Despite the company's position that "qualified" meant "test qualified" in the bargaining process, the union did not agree to change the language of the CBA to reflect this language and left the term unchanged when they negotiated the 2009 contract. The arbitrator considered the parties' intent and the bargaining history, but did not ultimately side with the company because the language of the CBA remained unchanged despite the company's position at negotiations. Broadly construing the agreement with all doubts being resolved in favor of the arbitrator's award, the Court finds the arbitrator interpreted the plain language of the CBA, and this interpretation draws its essence from the CBA.

B. Performance of Higher Classification

Arbitrator McKee found that the CSRs were required to perform the work of SRs, a higher-paid job title. The company argues that because lower-paid job titles also perform the disputed work, the CSRs cannot claim they are performing higher-paid SR work. The company cites a prior

8

arbitration award, the Heinsz award (AAA Case No. 71 300 00259 94 (JR 2647-65)), in which Arbitrator Heinsz found that both lower-paid titles and higher-paid titles performed the work at issue, and therefore the grievants could not establish they were performing higher-paid SR work. For legal support, the company cites this Court's decision in Trailways Lines, Inc. v. Trailways, Inc. Joint Council, 624 F. Supp. 880 (E.D. Mo. 1985), for the proposition that because a previous arbitration between the parties made this finding, this finding is now part of the parties' CBA and cannot be reformed by the arbitrator. The company claims Arbitrator McKee "ignored prior contrary and binding arbitration awards," namely the Heinsz arbitration award, and therefore the award fails to draw its essence from the CBA. (Pls.' Mem. at 10-11).

The Trailways case involved a interstate bus line's no-beards policy, which was arbitrated twice in an eight-month period under the same collective bargaining agreement. The first award, rendered August 8, 1984, held that the policy was reasonable and sustained the right of Trailways to enforce it. The second award, rendered by a different arbitrator on February 28, 1985, held the no-beards policy unreasonable and not enforceable. The facts and circumstances in both arbitration proceedings were identical in all material respects. Trailways, 624 F. Supp. 881. In fact, both arbitral proceedings "necessitated the construction of the *identical* contract provision of the *same national labor contract* between the *same* employer and the *same* union, in deciding the merits of a grievance involving the *same* issue under essentially the *same* facts and circumstances." Id. at 883 (emphasis in original).

The Court finds that the Heinsz arbitration award is not final and binding on Arbitrator McKee under Trailways, because the instant grievance does not involve the same issue under the same facts and circumstances as the prior Heinsz arbitration. The Heinsz arbitration addressed how CSRs used their computer terminals to forward information concerning sales they had made to their

9

customers, who had called regarding service problems. At some point prior to the early 1990s, CSRs would forward information regarding sales to the company's marketing business offices, where SRs or Service Order Writers entered the information into a mechanized system called SORD. In the early 1990s, however, CSRs could access SORD through their newly furnished computer terminals. Management decided it was more cost effective to have the CSRs enter order information concerning sales they had made to customers directly into SORD whenever the CSRs workload permitted. Time did not allow the CSRs to input all orders into SORD, and approximately fifty percent of all sales made by CSRs were still forwarded to the marketing department to process.

Here, Arbitrator McKee addressed a different issue. The company assigned work that was predominantly within the SR job description to lower-paid CSRs with a distinguishably different job description, trained the CSRs to perform this new order-related work, chose a SR to provide the necessary training, and then required CSRs to handle matters related to orders for new service and equipment. Unlike Trailways, in which two different arbitrators decided the identical issue under essentially the same facts and circumstances, here the issues are different and the facts and circumstances are different. The Trailways decision does not provide support for the company's position that the decision in the Heinsz arbitration is final and binding on the parties.

Moreover, Arbitrator McKee did not "ignore" the Heinsz award; he considered the decision, but distinguished it noting that in the present case the CSRs testified that performing the work of the SRs had become the primary component of their jobs. (JR 2833). Additionally, Arbitrator McKee used the principles of contract interpretation to find it unreasonable that the company should have the unilateral ability to render a provision of the contract meaningless. (JR 2834). Arbitrator McKee considered the Heinsz award and the company's position, but rejected it in favor of the union's position. He did not exceed his authority, as the Heinsz award was not final and binding on

10

the parties. The Court is not authorized to reconsider the merits of the award, but only determine whether it draws its essence from the CBA. Arbitrator McKee acted within his authority in construing and applying the contract, and the Court will not vacate the award.

C. <u>Temporarily Scheduled or Assigned</u>

The company's argument regarding whether the CSRs were "temporarily scheduled or assigned" to the higher-paid work rests again on Arbitrator Heinsz's prior arbitration award. Arbitrator Heinsz previously held that if the disputed work becomes a permanent part of an employee's job, the employee is not entitled to a pay differential.

The Court again concludes that Arbitrator McKee was not bound to follow the prior award in <u>Heinsz</u>. <u>See</u> Part IV.B., <u>supra</u>. Arbitrator McKee declined to follow the prior awards, stating that the grievants here testified that performing the work in question had become the *primary* component of their jobs. (JR 2833). He "respectfully depart[ed] from Arbitrators Heinsz and Fowler," stating:

> The contract does not specify any period of time after which assignment of work becomes "permanent" rather than temporary so as to preclude liability under Article XV, Section 7. The Union's argument—that the Company's proposed interpretation of this provision would allow it to avoid liability simply by violating the CBA for a prolonged period of time—is persuasive. Normal principles of contract interpretation suggest that it is unreasonable to conclude that the parties intended to give one party, the Company, the unilateral ability to render a provision of the contract meaningless, so long as there is another plausible interpretation.

(JR 2833-34).

Arbitrator McKee's reasoned and well-articulated departure from the prior awards does not provide grounds for vacating the award.

D. <u>Performed Higher-Paid Work "Throughout Two or More Full Tours in a Work Week"</u>

The company disputes the final element of the union's case: proof that the CSRs performed the work of the higher classification throughout at least two full tours in each work week for which

11

they seek a pay differential. To complicate matters, the company argues that the question of whether the CSRs performed the work of SRs throughout two full tours in each work week is inextricably tied to the question of the arbitrator's retained jurisdiction.

The union, on the other hand, argues that Arbitrator McKee ruled that the union had satisfied the requirement that work be performed throughout two or more full tours per work week—he sustained the grievance. The union states that the arbitrator's construction of the contract cannot be attacked in these proceedings. (Def. Opp'n at 12-13 (Doc. 31)). As to the question of retained jurisdiction, the union argues that the retained jurisdiction does not relate to the requirement that the work of the higher-paid title be performed for more than two tours in a week. Rather, the retained jurisdiction relates only to the unresolved question of the amount of back-pay required to make each respective CSR whole.

The Court construes the arbitration award consistent with the union's interpretation, and will uphold the validity of the award. The arbitration award states in relevant part:

> . . . The testimony of the CSRs established that they now work primarily, if not exclusively, on order-related matters. Some of the witnesses specifically testified that they perform this work for two or more full tours per week; other testified that they do this work on a "full time" basis. The Company did not rebut this testimony with documentary evidence of other, non-order-related work performed by the Grievants.
>
> At the hearing, Company counsel elicited testimony from many of the Grievants that the order-related work they described is a "regular, full-time duty."
> . . . .
>
> The Union was able to demonstrate that core competency SR work is being done by CSRs. Although the testimony on this point was uneven, evidence shows that the Grievants began performing significant amounts of order-related work following their completion of training in late fall 2008. This generally satisfies the requirement that the work be performed "throughout two or more full tours per work week[.]" However, Mr. Thurman's testimony and that of some of the Grievants persuades me that some or most of the Grievants continued working on trouble tickets after their training and move to the fourth floor, at least until that work was

eliminated entirely. It is possible that each of the CSRs did not perform order-related work throughout two or more tours each work week after their training occurred. As such, I grant the Union's request for a make-whole remedy and retain jurisdiction to resolve disputes over implementation.

## V. **AWARD**

For the reasons set forth above, the grievance is upheld. . . . The Grievants are entitled to be made whole for their losses. I retain jurisdiction for the specific purpose of resolving any disputes that may arise between the parties about the application or interpretation *of this awarded remedy*.

(JR 2837-39) (emphasis added).

The arbitrator stated that the evidence showed the grievants performed significant amounts of order-related work (i.e., SR work) following their completion of training in October 2008 and that the amount of work "generally satisfies the requirement" of performing the work of the higher title throughout two or more full tours in a workweek. (JR 2839). The arbitrator also found that many of the CSRs testified that they worked on order-related work on as a "regular, full-time duty." (JR 2838). In context, it is clear that the arbitrator's ruling determined that all the union needed to prove to sustain the grievance was that the work of a higher-paid title had been performed for more than two tours in a work week over the course of the four years that had passed from the October 20, 2008 training to the hearing on September 27 and November 7-8, 2012. The union's evidence was sufficient to convince him "generally" that enough higher-paid work was performed to trigger the requirement to pay the classification differential. These facts support his finding a breach of the CBA and sustaining the grievance.

Although the arbitrator found the union satisfied this requirement, he stated that based on Mr. Thurman's testimony, some of the grievants continued to work on CSR work after their SR training, until that CSR work was eliminated entirely. He, therefore, recognized the possibility "that *each* of the CSRs did not perform order-related work throughout two or more tours *each* work week

13

after their training occurred." (JR 2839) (emphasis added). "As such," he stated, "I grant the Union's request for a make-whole remedy and retain jurisdiction to resolve disputes over implementation." (Id.). In other words, because there was still CSR work to do after the CSRs went through their SR training, some of the grievants continued to perform CSR work after the training, at least until that CSR work was eliminated entirely. So, of the twenty CSRs who filed the grievance, all may not have performed SR work throughout two or more tours for all work weeks from the training date to the date of the hearing. Thus, because the damage award would differ for each of the twenty grievants, the arbitrator retained jurisdiction to resolve disputes over the "application or interpretation" of "this awarded [make-whole] remedy." (Id.).

This finding does not, as the company would have it, invalidate the arbitrator's ruling upholding the grievance. The Arbitrator had already ruled that the union had satisfied the requirement that the work be performed throughout two or more full tours per work week. The arbitrator was construing and applying the CBA and acting within his authority when he made this finding.

E. Retained Jurisdiction

Finally, the company argues that the arbitrator's granting the union's request for additional hearings regarding the application and interpretation of the remedy violates the long-settled *functus officio* doctrine. The company characterizes this act as "giv[ing] the Union additional bites of the apple with multiple hearings to try to prove a prima facie case." (Pl.'s Mem. at 19 (Doc. 25)). It states that the parties did not bargain for a bifurcated process in their arbitration article, nor do the AAA rules contemplate pre- and post-award hearings. For this reason, the company seeks to vacate the arbitrator's post-award ruing granting additional hearings.

14

The doctrine of *functus officio* holds that "once an [arbitrator] renders a decision regarding the issues submitted, [he] becomes *functus officio* and lacks any power to reexamine that decision." Domino Group, Inc. v. Charlie Parker Mem'l Found., 985 F.2d 417, 420 (8th Cir. 1993). The purpose of this doctrine is to limit "the potential evil of outside communication and unilateral influence which might affect a new conclusion." Id. The Court finds the doctrine of *functus officio* inapplicable to this case for a variety of reasons.

First, it bears repeating that the arbitrator unambiguously sustained the grievance. In no uncertain terms, he found "[t]he Company violated Article XV, Section 7 of the Departmental Agreement when it failed to pay Customer Service Representatives a Service Representative 'Classification Differential' after training and requiring them to handle matters related to orders for new service and/or equipment." (JR 2839). If the purpose of the *functus officio* doctrine is to limit the "potential evil" of outside communications affecting an arbitration award, that concern is of no relevance here. The violation occurred; the grievance was sustained. The arbitrator retained jurisdiction for the "specific purpose of resolving any disputes that may arise between the parties about the application or interpretation of this awarded [make-whole] remedy." (Id.). To the extent the Company argues the arbitrator is allowing the union additional bites at the apple to prove a prima facie case, the argument is entirely without merit. The award is perfectly clear that the retained jurisdiction relates "specifically" to disputes regarding the remedy, not the prima facie case regarding the violation. (JR 2839)

Despite the company's argument to the contrary, arbitrators frequently retain limited jurisdiction to resolve issues related to the implementation of a remedy ordered by the arbitrator, both at the request of the parties and *sua sponte*. See Frank Elkouri & Edna Asper Elkouri, How Arbitration Works 145 (Kenneth May ed., 6th ed. Cumm. Supp. 2010). In fact, the Seventh Circuit

15

found an arbitrator's ability to retain jurisdiction over disputes regarding the implementation of an award so well established that it upheld the issuance of Rule 11 sanctions against a party who claimed the arbitration was barred by *functus officio* from retaining jurisdiction to address damages. Id. at 146-47 (citing CUNA Mut. Ins. Soc'y v. Office & Prof'l Emp. Local 39, 443 F.3d 556, 565 (7th Cir. 2006) (*functus officio* did not bar arbitrator from retaining jurisdiction over disputes concerning implementation of arbitration award)); see also Utility Workers Union of Am., Local 335 v. Missouri-Am. Water Co., 2010 WL 4177772, **8-9 (E.D. Mo. Oct. 20, 2010) (citing cases) ("'Today, riddled with exceptions, *functus officio* is hanging on by its fingernails and whether it can even be said to exist in labor arbitration is uncertain.' Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union v. Excelsior Foundry Co., 56 F.3d 844, 846 (7th Cir. 1995)."). As Arbitrator McKee specifically cited in his ruling on the union's request for additional hearing, a 2007 amendment to the *Code of Professional Responsibility for Arbitrators of Labor-Management Disputes* allows discretionary retention of remedial jurisdiction unless otherwise prohibited by the parties' agreement or applicable law, even if one party objects.[2] (JR 3005-06). In fact, the company is no stranger to arbitration awards in which the arbitrator retains jurisdiction to resolve disputes regarding interpretation of the awarded remedy. See U-Verse Facilities Specialists, AAA Case No. 58 300 00025 11 (JR 2608) ("Jurisdiction is retained for the sole purpose of resolving any disputes that may arise between the Parties regarding the application or interpretation of this awarded remedy.").

The company's cited cases to the contrary are inapposite. See Pl. Opp'n at 13 n.27 (Doc. 29). In Local P-9, United Food & Commercial Workers International Union v. George A. Hormel

---

[2]The amendment was approved by the American Arbitration Association. See Frank Elkouri & Edna Asper Elkouri, How Arbitration Works 147, n.15 (Kenneth May ed., 6th ed. Cumm. Supp. 2010).

16

& Company, 776 F.2d 1393 (8th Cir. 1985), the Eighth Circuit did not decide the extent to which the *functus officio* doctrine was applicable to the arbitration proceedings. Id. at 1394 n.1. And in Legion Insurance Co. v. VCW, Inc., 198 F.3d 718, 720 (8th Cir. 1999), the arbitration award did not retain jurisdiction to resolve issues related to the implementation of the remedy.

Here, the arbitration award retained jurisdiction for the specific purpose of resolving any dispute between the parties about the application or interpretation of the awarded make-whole remedy. The parties expressly stipulated and granted the arbitrator authority to frame the issue to be decided, which included the appropriate remedy, and granted arbitral authority to resolve the issue. (JR 1930, 2821). Arbitrator McKee's retained jurisdiction allows him to resolve the question of the appropriate remedy, the outcome for which the parties bargained. Based on the Court's review of the arbitration award, there is no indication that the arbitrator exceeded his authority or that the award is either irrational or evidences a manifest disregard for the law. See Keirnan v. Piper Jaffray Cos., Inc., 137 F.3d 588, 594 (8th Cir. 1998) (quoting Lee v. Chica, 983 F.2d 833, 885 (8th Cir. 1993)).

F. Attorneys' Fees

In its counterclaim to enforce the arbitration award, CWA seeks an order requiring ASI to pay CWA's reasonable attorneys' fees. The statutory basis for the instant action, Section 301 of the Labor Management Relations Act, as amended, 29 U.S.C. § 185, does not provide for attorneys' fees. See American Fed'n of Musicians, Local 2-197, AFL-CIO v. St. Louis Symphony Soc'y, 203 F.3d 1079, 1081 (8th Cir. 2000). As a matter of equity, however, a prevailing party may recover fees in an action under § 301 if the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. Id.

The Court will deny CWA's motion for attorneys' fees. Although the Court rejects ASI's position, it does not find that ASI's position was argued in bad faith, vexatiously, wantonly, or for oppressive reasons.

### G. Permanent Injunctive Relief

In its counterclaim to enforce the arbitration award, CWA seeks specific performance of the award through a permanent injunction ordering ASI to comply with the award by paying all affected employees within the scope of the grievance retroactive pay in the amount of the classification differential which SBC failed to pay them in violation of the CBA. Counterclaim at 8-9. CWA's motion for summary judgment on its counterclaim does not mention its prayer for permanent injunctive relief, and the memorandum in support of the motion does not address the issue of injunctive relief, the standard for imposition of such relief, or the factors relevant to permanent injunctive relief in a case such as this. Consequently, the Court finds that the record has not been developed with regard to whether a permanent injunction is necessary for enforcement of the arbitrator's award, and CWA's request for such relief will be denied without prejudice.

## V. Conclusion

For the foregoing reasons, the Court concludes that the arbitrator's award should be enforced in all respects, including the arbitrator's retained jurisdiction. As a result, plaintiff SBC Advanced Solutions, Inc.'s motion for summary judgment should be denied, and defendant Communications Workers of America, District 6's motion for summary judgment should be granted. The Court will order SBC Advanced Solutions, Inc. to comply with the arbitrator's award by paying all affected employees within the scope of the grievance retroactive pay in the amount of the classification differential which ASI failed to pay them in violation of the collective bargaining agreement.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff SBC Advanced Solutions, Inc.'s motion for summary judgment is **DENIED**. [Doc. 17]

**IT IS FURTHER ORDERED** that defendant Communications Workers of America, District 6's motion for summary judgment is **GRANTED**. [Doc. 26]

A separate judgment will accompany this Memorandum and Order.

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  3rd  day of September, 2014.